**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| STUTMAN CONTRACTING, INC., *Plaintiff*, v. HUSSEY SEATING COMPANY, *Defendant*. | Civ. No.: 4:24-cv-40044-MRG |

**MEMORANDUM AND ORDER**

**GUZMAN, J.**

Defendant Hussey Seating Company ("Hussey") installed arena seating at the DCU Center in Worcester, Massachusetts, pursuant to a subcontract with Plaintiff Stutman Contracting, Inc. ("Stutman"). After completing its work, Hussey submitted invoices totaling approximately $730,000. Those invoices remain unpaid.

The nonpayment resulted from a payment diversion scheme in which a third-party fraudster gained unauthorized access to Stutman's email system and, posing as Hussey, directed Stutman to wire payment to a bank account controlled by the fraudster. Stutman followed those instructions. The funds were received by the fraudster rather than Hussey.

Stutman brought this action seeking to hold Hussey liable for the resulting loss. The undisputed summary judgment record establishes that Hussey did not breach the parties' subcontract. It further establishes that Stutman lacks Article III standing to pursue its remaining

1

claims. Hussey is therefore entitled to summary judgment on the breach of contract claim, and Stutman's remaining claims must be dismissed without prejudice.

Accordingly, the Court enters summary judgment in Hussey's favor on Count IV and dismisses the remaining claims without prejudice for lack of subject matter jurisdiction.

## I.   FACTUAL BACKGROUND[1]

The undisputed record establishes the following.

### A.  The Subcontract and Invoices

On May 4, 2023, Stutman and Hussey entered into a subcontract under which Hussey agreed to supply and install seating at the DCU Center in Worcester, Massachusetts (the "City"), for $1,086,295. [DSOF/PSOF ¶¶ 1–2].[2] Under the subcontract, Stutman's obligation to pay Hussey arose only after Stutman received payment from the City. [Id. ¶ 3]. Stutman thus served as the intermediary through which payment flowed from the City to Hussey. While Hussey's invoices directed payment by check to a P.O. box, the subcontract was silent on payment instructions. [Id. ¶¶ 3–4]. Hussey completed all work required under the subcontract and submitted monthly invoices eventually totaling approximately $731,861. [Id. ¶¶ 4, 42, 75; ECF No. 45-3 at 2–4]. Stutman contends that at least some of the invoices were submitted to "an unknown third party." [PSOF ¶ 4].

---

[1] The facts described in this section are undisputed unless otherwise noted. The Court derives the facts from the admitted portions of the parties' statements of material facts and the Court's own review of the record and determination of what facts are material. [Defendant's Statement of Material Facts ("DSOF"), ECF No. 45; Plaintiff's Opposition to DSOF ("PSOF") ECF No. 46-4]. If a party admitted a fact in part, the Court includes the substance of the undisputed part. The Court excludes facts, or parts of facts, that amount to legal conclusions, are immaterial, inadmissible at trial, or not supported by a citation to record evidence.

[2] Because PSOF responds to DSOF paragraph-by-paragraph, the Court cites the corresponding paragraphs together as "DSOF/PSOF ¶ __," rather than citing each filing separately. Thus, a citation such as "DSOF/PSOF ¶¶ 1–2" refers to DSOF ¶¶ 1–2 and PSOF ¶¶ 1–2.

### B.  The Payment Diversion Scheme

In July 2023, a third party—or multiple third parties—gained unauthorized access to at least one account on Stutman's Microsoft 365 email system. [DSOF/PSOF ¶¶ 21, 25]. The bad actor, or someone working in concert with the bad actor, registered spoofed internet domains resembling both Stutman's and Hussey's email domains and created an inbox rule that diverted incoming emails from Hussey away from the intended recipient. [Id. ¶¶ 28–31]. Stutman's forensic expert concluded that artifacts within Stutman's Microsoft 365 tenant indicated unauthorized access to a Stutman employee's email account. [Id. ¶ 21]. While Stutman argues that Hussey might have been able to prevent (or mitigate) the fraud by using anti-spoofing software (*e.g.*, Mimecast), Hussey's cybersecurity review found no evidence that Hussey's systems had been compromised. [Id. ¶¶ 54, 60, 69].

Using the spoofed Hussey email address, the bad actor advised a Stutman employee that Hussey's banking information had changed and requested payment by wire transfer. [Id. ¶¶ 33–40]. The bad actor then provided wire instructions for a bank account that did not belong to Hussey. Stutman did not verify the requested change with Hussey before transmitting payment. [Id. ¶¶ 32–40]. In furtherance of the scheme, the bad actor—*posing as a Stutman employee*—also obtained payroll records from Hussey, which it later used to further dupe Stutman into wiring the funds. [Id. ¶¶ 43–45].

Between August and October 2023, Stutman wired three payments totaling $731,861 to the fraudulent account. [Id. ¶ 42]. During the same period, the bad actor separately communicated with Hussey while impersonating Stutman and assured Hussey that payment was forthcoming. [Id. ¶¶ 41–51].

On October 12, 2023, after Hussey contacted Stutman regarding the missing payments, the parties discovered that they had both been communicating with a fraudster. [Id. ¶¶ 52–53]. Stutman thereafter reported the incident to local law enforcement, and the United States Secret Service subsequently became involved in the investigation. [Id. ¶¶ 61–63].

### C.  The Bond Claim

Before Hussey performed any work under the subcontract, Stutman obtained a payment bond from Zurich North America ("Surety") to secure payment to subcontractors and suppliers.[3] [ECF No. 45-23 at 2]. Because the project was bonded, Hussey submitted a claim against Stutman's payment bond for the  unpaid subcontract balance. [DSOF/PSOF ¶ 77]. The Surety declined to pay the claim pending resolution of this litigation, stating that a bona fide dispute of material fact existed regarding the claim. [Id. ¶¶ 76–88; ECF No. 45-29 at 2]. Nothing in the summary judgment record indicates that, before this action was filed, Hussey made any direct demand on Stutman beyond submitting its unpaid invoices and pursuing its claim against the payment bond.

While several facts remain in dispute, none are material to the resolution of the present motion.[4]

---

[3] Fidelity and Deposit Company of Maryland, an entity that appears in the record, appears to be a part of Zurich North America.

[4] The Court notes that throughout its Statement of Facts, Stutman disputes whether Hussey has established that the same bad actor or third party was responsible for the various events underlying the alleged fraud. Stutman disputes that the record establishes who registered the look-alike domain "@stutrnancontracting.com" and argues that the domain was a separately registered domain rather than a proven "spoof." [DSOF/PSOF ¶¶ 28–31]. Stutman also disputes that the record establishes that the person who requested a change in payment method and provided wiring instructions was the same bad actor responsible for the fraud, asserting instead that the communications came from someone with "apparent authority" from Hussey. [Id. ¶¶ 32–34]. Relatedly, Stutman disputes Hussey's characterization of Stutman's internal wire-verification practices, asserting that it reasonably relied on its bank's instructions and that no contractual or

## II.    PROCEDURAL HISTORY

Stutman commenced this action on March 18, 2024, asserting claims for declaratory judgment, negligence, mutual mistake/equitable reformation, breach of contract, breach of the implied covenant of good faith and fair dealing, indemnification, and violation of Mass. Gen. Laws ch. 93A. [ECF No. 1]. Hussey answered, denied liability, and asserted counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, negligence, and violation of Mass. Gen. Laws ch. 93A. [ECF No. 7]. Following discovery, Hussey moved for summary judgment, in part, on Stutman's breach of contract claim (Count IV). [ECF No. 43 ¶ 4(e)]. The motion is fully briefed. [ECF Nos. 44–48]. The Court heard oral argument on June 18, 2026, and thereafter took the motion under advisement. [ECF No. 56].

## III. DISCUSSION

The Court begins with Stutman's breach of contract claim (Count IV) against Hussey.

### A.  Count IV (Breach of Contract) Fails as a Matter of Law

Stutman contends that Hussey breached the subcontract. To prevail on a breach of contract claim under Massachusetts law, a plaintiff must "show the existence of a valid and binding contract, that the defendant breached the contract's terms, and that the plaintiff suffered damages as a result of that breach." Scholz v. Goudreau, 901 F.3d 37, 43 (1st Cir. 2018) (citing Brooks v. AIG SunAmerica Life Assurance, Co., 480 F.3d 579, 586 (1st Cir. 2007)).

---

industry-standard obligation required further verification. [Id. ¶¶ 35–40]. Similarly, Stutman disputes that the record establishes that the same bad actor requested payroll records from Hussey, asserting instead that those communications came from—or may have come from—another third party. [Id. ¶¶ 43–45]. Stutman further disputes that the parties conclusively determined during the October 12, 2023 call that they had been communicating with a hacker, asserting instead that they discovered they had been communicating with a third party and that Stutman's wire payments had not allegedly reached Hussey. [Id. ¶¶ 52–53]. The Court finds these factual disputes immaterial to the resolution of the present motion.

Count IV alleges that Hussey breached the subcontract by filing a claim on Stutman's payment bond in December 2023. [Compl. ¶¶ 50–52]. Stutman's complaint cites no contractual provision that Hussey violated by doing so, and none is readily identifiable. In opposition briefing, Stutman belatedly[5] identifies three contractual provisions that it contends support its theory. [ECF No. 46 at 13–14]. None supports that theory. The Court considers each provision in turn.

### 1. Paragraph 5.

Stutman points to paragraph 5, the indemnification clause, which obligates Hussey to defend and hold harmless Stutman from liabilities and losses "arising out of or resulting from [Hussey's] actual or alleged acts or omissions *in the construction of the Project*" and further limits the clause's reach to claims attributable to "(1) bodily injury, sickness, disease, or death, or destruction of property." [ECF No. 45-2 at 4 ¶ 5 (emphasis added)]. This limiting language, which Stutman partially omits from its briefing, underscores the inapplicability of paragraph 5 to these circumstances. Hussey's filing of a bond claim following nonpayment is neither an act nor omission in the construction of the project, and it does not implicate bodily injury or property destruction. Therefore, Hussey did not breach the subcontract by filing the bond claim.

### 2. Paragraph 20.

Stutman invokes paragraph 20, which it characterizes as a "risk-shifting clause," [ECF No. 46 at 9], arguing that the language "All loss or damage to the Subcontract Work resulting from any cause whatsoever shall be borne by Subcontractor" requires Hussey to absorb the payment

---

[5] Ordinarily, a plaintiff may not "raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment." Miranda-Rivera v. Toledo-Davila, 813 F.3d 64, 76 (1st Cir. 2016) (quoting Calvi v. Knox Cnty., 470 F.3d 422, 431 (1st Cir. 2006)). Because Stutman's arguments rely solely on provisions of the subcontract attached to and incorporated into the Complaint, however, the Court addresses them on the merits.

diversion scheme fraud loss and therefore prohibits the bond claim. [Id. 9–10, 13–14; ECF No. 45-2 at 6 ¶ 20]. This argument likewise fails because the text of the subcontract forecloses it.

Specifically, "Subcontract Work" is defined as "the work to be performed by this subcontractor"—here, the installation of seating at the DCU Center. [ECF No. 45-2 at 4 ¶ 1]. Because the payment diversion scheme caused no loss or damage to the Subcontract Work, paragraph 20 did not require Hussey to absorb that loss. Nor did it prohibit Hussey from pursuing payment through the bond. Stutman contends otherwise.

Stutman argues that the clause should instead be read to create two separate categories: **(1)** "all loss . . . resulting from any cause whatsoever" without qualification **and (2)** "damage to the Subcontract Work." [ECF No. 46 at 9–10]. Under that reading, the qualifying language "to the Subcontract Work" applies only to "damage," leaving "all loss" as an unqualified category encompassing *any* financial loss—including the payment diversion fraud at issue here. [Id.] The Court disagrees.

Stutman's construction improperly extracts the word "loss" from the phrase "loss or damage to the Subcontract Work." [ECF No. 45-2 at 6 ¶ 20]. The grammatical structure of the sentence does not support treating "loss" as an unqualified term. The qualifying language "to the Subcontract Work" follows the coordinated nouns "loss or damage" and naturally limits both.

The series-qualifier canon supports this interpretation and counsels against Stutman's proposed construction. See Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012). Under that canon, and "conventional rules of grammar, '[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series,' a modifier at the end of the list 'normally applies to the entire series.'" Facebook, Inc. v. Duguid, 592 U.S. 395, 402 (2021) (quoting id.). The canon reflects the ordinary principle that "[w]hen several words

are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all." Porto Rico Ry., Light & Power Co. v. Mor, 253 U.S. 345, 348 (1920) (citations omitted).

Even if the text left room for doubt—which it does not—Stutman's interpretation fails for an independent reason: it would produce an extraordinary and unreasonable allocation of risk. Under Stutman's reading, the subcontract would require Hussey to bear financial losses having no connection to its work installing seating, including losses arising from payment fraud occurring after completion of its work. Nothing in the subcontract suggests that the parties intended such an extraordinary allocation of risk. Massachusetts law instructs courts to construe contracts reasonably and to avoid interpretations producing absurd results. See, e.g., Brillante v. R.W. Granger & Sons, Inc., 772 N.E.2d 74, 79–80 (Mass. App. Ct. 2002); USM Corp. v. Arthur D. Little Sys., Inc., 546 N.E.2d 888, 893 (Mass. App. Ct. 1989). The Court accordingly rejects Stutman's construction of paragraph 20.

### 3. *Paragraph 11.*

Stutman, albeit fleetingly, invokes paragraph 11's provision providing for monthly payment, [ECF No. 45-2 at 5 ¶ 11], ostensibly arguing that Hussey breached the subcontract by waiting thirty to forty-five days after submitting invoices before following up on nonpayment. [ECF No. 46 at 9]. The Court rejects this theory too. Paragraph 11 defines when Stutman's payment obligation matures; it says nothing about any duty Hussey owes to *pursue* payment on a particular timeline, let alone that a delay in doing so constitutes breach *by Hussey*. Stutman identifies no contractual language imposing such a duty.

\* \* \*

More fundamentally, Stutman's breach of contract theory rests on the premise that Hussey acted improperly by seeking payment from the Surety after Stutman wired funds to the fraudster. But the undisputed record establishes that Hussey never received those funds. The subcontract obligated Stutman to pay Hussey for the work it performed, not merely to transmit funds to a third party impersonating Hussey. Thus, absent some contractual provision prohibiting Hussey from pursuing payment from the surety under these circumstances—and Stutman has identified none—Hussey's submission of a claim against the payment bond cannot constitute a breach of the subcontract.

In short, none of the contractual provisions on which Stutman relies prohibited Hussey from pursuing payment from the Surety on invoices it indisputably had not been paid. Because no reasonable jury could conclude that Hussey breached the subcontract, Hussey is entitled to judgment as a matter of law on Count IV.

### B.  Stutman Has Suffered No Actual or Imminent Injury

Because the Court concludes that Hussey did not breach the subcontract, it must determine whether Article III jurisdiction exists over Stutman's remaining claims. U.S. CONST. art. III, § 2; TransUnion LLC v. Ramirez, 594 U.S. 413, 431 (2021) (citing Davis v. Fed. Election Comm'n, 554 U.S. 724, 734, (2008)) ("standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek"). The Court undertakes this analysis mindful that "[s]tanding in the jurisdictional sense is based on the facts as they existed at the time the complaint was filed." Steir v. Girl Scouts of the USA, 383 F.3d 7, 15 (1st Cir. 2004) (citing Mangual v. Rotger-Sabat, 317 F.3d 45, 58 (1st Cir. 2003)).

To establish standing, Stutman must demonstrate "(1) that [it] suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by [Hussey],

and (3) that the injury would likely be redressed by the requested judicial relief." Thole v. U. S. Bank N.A, 590 U.S. 538, 540 (2020) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–561 (1992)). "The imminence requirement is met 'if the threatened injury is certainly impending or there is a substantial risk that the harm will occur.'" Massachusetts v. United States Dep't of Health & Hum. Servs., 923 F.3d 209, 222 (1st Cir. 2019) (quoting Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014)).

The Court concludes that Stutman has not established the existence of an Article III injury in fact as of the date this action was filed. As of the filing date, Hussey had submitted a claim against the payment bond, and the Surety was investigating that claim. [DSOF/PSOF ¶¶ 77–88]. But the existence of an unresolved investigation does not itself constitute a concrete injury to Stutman. Hussey's bond claim, filed with the Surety, sought payment from the Surety. [ECF No. 45-24 at 2]. As of March 18, 2024, the date the Complaint was filed, the Surety had neither paid Hussey's claim nor determined that payment was owed. Nor had the Surety asserted any possible indemnification rights against Stutman or otherwise imposed any financial obligation upon it.

The injury asserted by Stutman depends upon a series of contingent events that had not occurred and, on this record, were not shown to be imminent. The Surety would first have to determine that Hussey's claim was valid. The Surety would then have to elect to make payment under the bond. Next, the Surety would have to invoke whatever indemnification rights it possessed against Stutman, if any at all. And Stutman would ultimately have to incur an actual financial obligation because of that process. At the time suit was filed, each of those events remained uncertain.

The Supreme Court has repeatedly held that Article III does not permit standing to rest upon a speculative chain of possibilities dependent upon the discretionary decisions of independent

actors. Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (quoting Whitmore v. Arkansas, 495 U.S. 149, 158 (1990)) (observing that "we have repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient" and collecting cases) (emphasis in original); see also R&D Master Enterprises, Inc. v. Fin. Oversight & Mgmt. Bd. for P.R., 75 F.4th 41, 48–49 (1st Cir. 2023) (allegations "too speculative" to confer standing).

Here, the alleged injury depends on precisely that type of chain. The Court cannot conclude that an injury was "certainly impending," nor has Stutman shown a "substantial risk" of harm sufficient to satisfy Article III. Massachusetts, 923 F.3d at 222 (quoting Driehaus, 573 U.S. at 158).

The record before the Court further undermines the claim of imminence. Specifically, before this lawsuit was filed, the Surety had communicated to Stutman that it was adopting or relying upon Stutman's position regarding the payment diversion fraud scheme.[6] Whether characterized as agreement with Stutman's defenses or acceptance of Stutman's account of the facts, the significance is the same: the only entity capable of creating the indemnification exposure on which Stutman principally relies had not indicated an intent to impose liability upon Stutman. To the contrary, at the time the action was commenced, the evidence points in the opposite direction.

That circumstance distinguishes this case from situations in which a plaintiff faces an immediate and credible threat of enforcement or liability. At filing, Stutman was not the subject of a demand, enforcement action, or adverse determination. Stutman faced only the possibility that

---

[6] Indeed, the Surety told Hussey "Your position regarding the [payment diversion scheme] is our position" and requested Stutman's position in order to "respond to [Hussey] appropriately." ECF No. 45-28 at 4.

a third party might eventually reach conclusions adverse to its interests and might later seek recovery based upon those conclusions. And post-filing events, including counterclaims, can neither cure this defect nor retroactively create jurisdiction where none existed at the outset. Steir, 383 F.3d at 15 (citing Mangual, 317 F.3d at 58).

The Court therefore concludes that Stutman has failed to demonstrate a concrete and particularized injury that was actual or imminent on March 18, 2024 when Stutman initiated this action. What existed at that time was an unresolved commercial dispute and an ongoing surety investigation. Because the alleged future injury depended upon a series of discretionary decisions by an independent third party that had not occurred—and were not shown to be certainly impending when suit was filed—Stutman has failed to establish an injury in fact sufficient to invoke Article III jurisdiction.

Although the Court resolves this case on Article III standing grounds, the same result follows under the doctrine of ripeness. "The doctrines of standing and ripeness 'originate' from the same Article III limitation," and, in cases such as this one, "standing and ripeness issues . . . 'boil down to the same question.'" Driehaus, 573 U.S. at 157 n.5 (quoting DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 335 (2006), and MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127–28 & n.8 (2007)). "In both the standing and ripeness inquiries . . . we ask 'whether the harm asserted has matured sufficiently to warrant judicial intervention.'" Jensen v. Rhode Island Cannabis Control Comm'n, 160 F.4th 18, 24 (1st Cir. 2025) (quoting Sindicato Puertorriqueño de Trabajadores v. Fortuño, 699 F.3d 1, 10 n.5 (1st Cir. 2012)). For the reasons already discussed, it had not. At the time Stutman filed this action, Stutman's alleged injury depended on a series of contingent events that had neither occurred nor been shown to be imminent. The controversy therefore was not ripe for judicial resolution.

**IV. CONCLUSION**

For the foregoing reasons, Defendant Hussey Seating Company's Motion for Summary Judgment is **GRANTED** as to Count IV. Counts I, II, III, V, VI, and VII are **DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction. Hussey has also asserted counterclaims, [ECF No. 7], which are not resolved by this Order.

**SO ORDERED.**

Dated: July 29, 2026

/s/ Margaret R. Guzman
Margaret R. Guzman
United States District Judge